UNITED STATES DISTRICT COURT
DISTRICT OF MASSACHUSETTS

| | |
|---|---|
| MACHINE PROJECT, INC. and KINSER CHIU, Plaintiffs, | ) ) ) ) |
| vs. | ) **CIVIL ACTION NO.** ) |
| PAN AMERICAN WORLD AIRWAYS, INC. and ANTHONY LUCAS, Defendants. | ) ) ) ) ) |

**COMPLAINT AND JURY DEMAND**

Machine Project, Inc. ("MPI") and Kinser Chiu ("Chiu") (hereinafter individually referred to as "Plaintiff" and collectively as "Plaintiffs") hereby bring the following Complaint against Pan American World Airways, Inc. ("Pan Am") and Anthony Lucas ("Lucas") (hereinafter individually referred to as "Defendant" and collectively as "Defendants").

**INTRODUCTION**

The Plaintiffs in this action seek damages against the Defendants for Pan Am's breach of its written agreement with MPI pursuant to which MPI was given the right to design, manufacture and sell goods bearing trademarks owned by Pan Am. During the executory phase of this contract, Pan Am and Lucas, Chiu's partner in the MPI venture, engaged in a pattern of deceptive and fraudulent conduct aimed at stripping Chiu of his proprietary interest in MPI and depriving Chiu of the fruits of the agreement with Pan Am.

**PARTIES**

1.  MPI is a corporation organized under the laws of the State of New York

1

with a principal place of business located at 241 West 37th Street, Suite 720, New York, New York.

2. Chiu is a natural person and was President and 50% owner of MPI.

3. Pan Am is a corporation organized under the laws of the State of Delaware with a principal place of business located in New Hampshire.

4. Lucas is a natural person and a resident of the State of New Jersey. Lucas was Secretary and 50% owner of MPI.

## ALLEGATIONS OF FACT

*Chiu and Lucas Embark on a Joint Venture to form MPI*

5. Pursuant to a Merchandising License Agreement dated as of or about September 2, 2005 ("2005 MLA") entered into by Pan Am and Machine Ltd., the predecessor in interest to MPI, Machine Ltd. was granted the right to authorize others to use Pan Am's trademarks in certain territories. Machine Ltd. was not given any right to manufacture or use the Pan Am trademarks itself under the 2005 MLA.

6. The 2005 MLA was signed, on behalf of Machine Ltd., by Lucas. Lucas was the sole owner of Machine Ltd. at the time the 2005 MLA was executed.

7. The 2005 MLA had a commencement date of September 2, 2005 and a termination date of May 31, 2008.

8. Because of Lucas' lack of contacts in Asia, Europe and South America, he was unable to procure any contracts in furtherance of the sublicensing rights afforded under the 2005 MLA in the months following the commencement of the 2005 MLA.

9. In an effort to reverse this lack of success, Lucas approached Chiu to seek his assistance in reviving and developing the Pan Am brand.

10. Following at least two visits by Chiu and Lucas to New Hampshire to meet with Robert Culliford, Senior Vice President and General Counsel for Pan Am, as well as two other Pan Am officers, David Fink and Stacey Beck, Pan Am and Chiu and Lucas agreed that Chiu would begin manufacturing and marketing Pan Am branded products.

11. The joint venture between Chiu and Lucas in this regard was memorialized by a "letter of intent" dated April 6, 2006 wherein Chiu agreed to "help" in the development of the Pan Am license in exchange for a 50% ownership stake in Machine Ltd. This letter of intent was executed by Chiu and Lucas on April 12, 2006.

12. This letter of intent stated that it "constitutes a binding commitment by the parties…"

13. Through other communications that followed Lucas and Chiu's execution of the letter of intent, Lucas made numerous representations that Chiu had a proprietary interest in Machine Ltd.

14. In reliance on the aforesaid letter of intent as well as representations made by Lucas and Pan Am, Chiu began investing capital and time to further this endeavor including reaching out to his contacts in Asia.

15. Because of issues with a former business partner, Lucas did not want to carry on the venture under the name Machine Ltd. Consequently, he and Chiu agreed to form a new corporate entity with which to carry out their joint venture. The entity that the two formed together was MPI.

16. Lucas was entrusted to complete and file the necessary documents with the New York Department of State. In response to an inquiry from Chiu regarding

the status of the preparation and filing of these materials, Lucas responded that he "ordered all of the corporation paperwork" and further advised that it could take "as much as three weeks for the charter." Lucas further stated, "I have given you the tax ID number for the new corp, a document saying we are partners, a contract saying we are partners, a document saying we are the licensor from Pan Am and the contract from Pan Am saying what rights we have. I think all of this should get you what you need for now." Lucas concluded his email by stating: "Also, we need an agreement between ourselves, for reasons such as – if one of us wants out of the corp, one of us dies, if both of us die, if one of us is not doing what we agreed to, etc."

17. MPI's corporate filings identified Chiu as the "President."

18. MPI entered into a lease agreement for property needed to further its interests. The lease agreement, which covered a five-year period commencing on June 1, 2006, was executed by both Chiu and Lucas on behalf of MPI.

19. To date, Chiu had financed the entirety of the venture.

20. Shortly thereafter, on June 15, 2006, a corporate bank account was opened for MPI. The account opening documents were signed by Chiu and Lucas.

21. Conduct of the parties as well as numerous other documents generated or executed around this time period show that MPI was a joint venture between Lucas and Chiu. Some illustrative examples include:

    a) A Corporate Banking Resolution that identified Chiu as the president of MPI and Lucas as its Secretary.

    b) "Contract Amendment No. 1 to Merchandising License Agreement," dated June 19, 2006, wherein Pan Am and MPI agreed to amend the 2005

    MLA "in order to reflect certain business name and address changes undertaken by MACHINE" was executed by both Lucas and Chiu on behalf of MPI.

 c) Chiu took a critical role in negotiating the terms of an interim agreement as well what would eventually would become the 2007 Merchandising License Agreement by making it clear to Pan Am and the ability to market and sell products in Japan was crucial to entering into a formal, long term agreement as Japan would be the single largest market for these products and that MPI's right to market/sell in Japan must be exclusive.

<em><u>The 2007 Merchandising License Agreement</u></em>

22. A Merchandising License Agreement, dated as of or about January 1, 2007 ("2007 MLA") was executed on April 20, 2007 by Culliford on behalf of Pan Am and by Chiu and Lucas on behalf of MPI.

23. It was expected that Chiu would utilize his extensive contacts in the Far East in arranging for the manufacture and sale of Pan Am branded products in places like Japan, China and Hong Kong. Japan, in particular, was very important to Chiu, who had received express and specific representations (which were memorialized in an additional exhibit to the agreement) and assurances that Japan would be included within the territory covered by the 2007 MLA.

24. The 2007 MLA provided MPI with, *inter alia*, "the exclusive, sublicensible right…to use [Pan Am's trademarks] in the Territory on Merchandising Products and in connection with the sale, distribution, advertising and promotion of Merchandising

5

Products in the Territory [emphasis supplied]." The term "Territory" was defined in the 2007 MLA as being: [1] Asia, which was specifically defined as including the country of Japan; and [2] the rest of the world besides Germany and the EU."

25.  The 2007 MLA established annual gross revenue requirements for MPI to reach.

26.  The 2007 MLA provided that in the event MPI failed to meet the gross revenue requirements set forth therein,

> i. [Pan Am] shall have the option (i) to collect from [MPI] the Royalty that would have been due from [MPI] if the Minimum Performance Requirement for such Royalty Year had been satisfied (with a credit for Royalty payments already made on [MPI's] Gross Revenues for that royalty Year), or (ii) to terminate this Agreement and all licenses granted herein upon thirty (30) days written notice to [MPI].

27.  The 2007 MLA provided that it could be terminated by either party upon thirty (30) days written notice to the other party in the event of a breach of a material provision of this Agreement by the other party, provided that, during the thirty (30) day period, the breaching party fails to cure such breach." The 2007 MLA further provided that upon termination, MPI "will have one year to sell all Inventory."

28.  Finally, the 2007 MLA contained the following so-called forum selection clause:

> All disputes under this Agreement shall be resolved by the courts located in the State of Massachusetts in Boston, Massachusetts, including the United States District Court for the District of Massachusetts and each of the parties consents to the jurisdiction of such courts, agrees to accept service of process by mail and hereby waives any jurisdiction or venue defenses otherwise available to it.

*Chiu Invests Significant Time, Money and Resources to Further the Joint Venture*

29.  Following the execution of the 2007 MLA in April 2007, Chiu continued

to arrange for and finance the manufacture of Pan Am branded products. Products were designed by Lucas's wife, Beth Barenborg ("Barenborg"), produced by Chiu's Asian manufacturers and marketed to retail stores by one, Robyn Goodman. The entire operation was financed by Chiu, with neither Lucas nor Pan Am paying for any aspect of the brand development. Pan Am's Director of Marketing, Stacey Beck, would interact with Chiu to "monitor sales" and "view products."

30. On September 10, 2007, Lucas advised Culliford via email that he had discovered that a third-party has registered Pan Am trademarks in Japan and is selling products in Japan bearing the Pan Am trademarks.

31. Neither Culliford nor Lucas informed Chiu about the trademark problem in Japan at or around this time.

32. By the Fall of 2007 Chiu's expenditures in furtherance of the venture were approaching $1 million.

*Pan Am and Lucas Take Actions to Oust Chiu and
Deprive Chiu of the Fruits of the 2007 MLA*

33. Despite Chiu's significant investments, Pan Am was allegedly dissatisfied with the progress of the branding program and Culliford's superior, Fink, directed Culliford and Beck to "fix" the problem.

34. On October 29, 2007, Culliford asked Lucas that Lucas call him to discuss "the business plan" with him and Beck. It was at this time that they raised the prospect of ousting Chiu.

35. In response to this idea, Culliford, on Sunday, November 11, 2007, at 4:24 p.m., sent an email to Lucas stating:

7

> We need your numbers to make a proper proposal. The original idea was to have them by Saturday so we could discuss today, correct? Yet, we have no numbers, you are not answering your cell phone and your new home number is private. We are trying to help you as I know you are trying to help us, but we need your information.
> Call or e mail ASAP.

36. Later on November 11, 2007 Lucas sent separate emails to Culliford and Beck, at 7:12 p.m. and 7:35 p.m., respectively, outlining a prospective deal with Pan Am that would oust Chiu. This proposal was sent at Pan Am's request following additional telephone conversations between Lucas and Beck in which they discussed ousting Chiu. Lucas represented that Machine Project expected "to achieve a break even position within the next six months," thereby making it an opportune time to oust Chiu. In this vein, Lucas further represented as follows:

> Machine Expects to achieve a break even position within the next six months. However, due to financial issues, Machine Project is looking for a suitable financial partner to take over half the ownership, which is currently retained by Kinser Chui[sic]. Kinser's responsibility has been the financing of inventory, marketing and the day to day operational costs. [enclosed] Currently, [Chiu] has invested in current inventory, marketing, sales and the costs associated with the day-to-day operations. Machine Project[sic] has assessed that [Chiu] would be willing to <u>sell his share in Machine Project Inc.</u> in exchange for reimbursement of his investment in Machine Project to date [emphasis supplied].

37. The representation made by Lucas that Chiu would be willing to sell his interest in MPI "in exchange for reimbursement of his investment…to date" was and is completely untrue.

38. Following this exchange, Lucas and Pan Am continued to have discussions on what they would to do oust Chiu as well as the ownership stakes that Pan Am and Lucas would have in the venture going forward. In this vein, Lucas and Pan Am engaged in the following communications:

a)  On the morning of December 28, 2007, Lucas sent Culliford and Beck emails containing a "deal memo" which stated, in pertinent part:

> Upon the approval of terms and the ratification of a letter of intent, <u>Machine would secure 100% ownership through the settlement of terms with Kinser Chui</u>[sic] [emphasis supplied]. Once this is completed, Machine would transfer 49% ownership of Machine Project to Pan Am. In exchange, Machine would provide funding, a line of credit, management and operational support.

b)  On December 28, 2007, at 11:25 a.m., Lucas sent an email to Beck, the subject of which entitled "OVERVIEW" in which he recounted numerous problems which Machine Project had encountered since executing the 2007 MLA:

> One of the main reasons I pursued the Pan Am license so hard, was the trademarks potential worldwide. I understood when Machine signed the agreement; it was not getting the EU. <u>However, not being allowed to enter the Japanese market has damaged sales significantly and curtailed sales by at least one third</u> [emphasis supplied].

c)  On December 28, 2007, at 11:42 a.m., Lucas sent a follow-up email to Beck and Culliford, which stated as follows:

> Here is the deal.
>
> UPSIDE
> Profit[s] are here already – this is no start up
> Demand has already been proved
> The 5th most recognized name in the world
> This is the deal of a lifetime with very little risk
> <u>My partner is leveraged to the roof</u> because of business mistakes he made outside of Machine Project/Pan Am

9

>Downside
>We have to move now – My company should be re-capitalized by the spring due to our sales beginning to move [existing orders] with the department stores
>In other words – we have a small window to get this deadbeat out
>[emphasis supplied]

39. In addition to the foregoing, Lucas, in or around the early 2008 timeframe, retroactively filled out and backdated the corporate forms for MPI after he had taken these documents without authority to do so from MPI's offices to indicate that he was the **sole** shareholder of MPI and Barenborg was the Secretary of MPI. Upon information and belief, Lucas made these alterations at his own home at around 8:00pm

40. The plans to oust Chiu continued to be discussed between Lucas and Pan Am into 2008. Chiu had no knowledge of any of this plot during this time nor could he have reasonably discovered same. Indeed, in late February or early March of 2008, Chiu stated directly to Beck that he [Chiu] has an ownership interest in MPI.

41. During a "trunk show" that was held at the Bloomingdales flagship store in New York City in March of 2008, certain Pan Am branded products were put on display. The production and manufacture of these products was financed by Chiu and the intended manufacturer was an entity known as Breton Asia, owned by one Kenny Cheung. Pan Am viewed the products that were displayed at this trunk show and deemed the presentation to be a "good job."

42. Unbeknownst to Chiu, however, Pan Am had already decided to terminate the 2007 MLA and a letter memorializing the termination had already been "typed up" by this time.

43. Within days of the Bloomingdales trunk show, Pan Am would unilaterally terminate the 2007 MLA and arrange, through Lucas and circumventing Chiu, for the manufacture of the goods displayed at the trunk show with Mr. Cheung.

*Pan Am Terminates the 2007 MLA and Employs Lucas and his Wife
To Carry Forward The Pan Am Product Line*

44. Pan Am provided a Notice of Termination dated March 14, 2008 to Lucas only in or around March 14, 2008. In that Notice of Termination, Pan Am sought to terminate the 2007 MLA and took the position that it was entitled to do so because, among other things, the minimum gross revenue requirements set forth in the MLA were not met.

45. Pan Am did not provide the Plaintiffs with a full "Royalty Year" to meet the minimum revenue requirement.

46. Lucas told Chiu about the Notice of Termination but refused to provide a copy of same to Chiu.

47. Chiu's requests to Pan Am to provide a copy of the Notice to Termination were denied.

48. Thwarted in his efforts, Chiu then sought the assistance of counsel. By a letter dated April 9, 2008, Raymond W. M. Chin, Esq., on behalf of Chiu, requested that Pan Am provide a copy of the Notice of Termination so that Chiu and MPI could take the actions necessary to get the endeavor back on track.

49. In response to Mr. Chin's April 9, 2008 letter, Pan Am, by letter dated the next day, again refused to provide a copy of the Notice of Termination asserting, to the great surprise of Chiu, that Pan Am did not feel that it had to provide a copy of this

because it believed that Chiu did not have a proprietary interest in MPI.

50.     That Chiu did not have an ownership stake in MPI at this time is patently false.

51.     At this time, Chiu was ready willing and able to expend his own personal funds to cure the alleged default and would have done so were he provided the opportunity.

52.     By August, 2008, Pan Am had employed Lucas as "Head of Marketing" and his wife as merchandising and design manager to further the very same pursuits contemplated by the 2007 MLA. Both were jointly interviewed by Pan Am and hired on the same day in what has been described as a "package deal."

53.     Despite Chiu's investment of over $1MM into the Pan Am venture, which was made in reliance of representations contained in the 2007 MLA as well as those made by Lucas and Pan Am, Pan Am and Lucas unlawfully ousted Chiu from the endeavor and Pan Am and Lucas continue to reap large profits from it today.

54.     As a result of this aforementioned conduct, Chiu was forced to try to sell the products that had already been manufactured to Pan Am. Lucas, with the assistance of his wife, thwarted Chiu's efforts in this regard by misrepresenting the nature and quality of the existing goods (which were designed and approved by Barenborg) causing Pan Am to undervalue them. This consequently led to a breakdown of negotiations between Pan Am and Chiu, causing Chiu to incur further damage.

**COUNT I – BREACH OF CONTRACT**
**(MPI v. Pan Am)**

55. The Plaintiffs repeat and reallege paragraphs 1 through 54 above as if individually set forth herein.

56. Pan Am breached the 2007 MLA with MPI by engaging in the aforesaid conduct which includes, but is not limited to, failing to provide an opportunity to cure as provided in the 2007 MLA, failing to provide a full "Royalty Year" to meet the minimum revenue requirement and by failing to provide Chiu with reasons for why it was terminating the contract.

57. MPI has been damaged by the aforesaid conduct and continues to sustain damages.

## COUNT II – BREACH OF COVENANT OF GOOD FAITH AND FAIR DEALING
**(Plaintiffs v. Pan Am)**

58. The Plaintiffs repeat and reallege paragraphs 1 through 57 above as if individually set forth herein.

59. Pan Am breached the covenant of good faith and fair dealing vis-à-vis each of the Plaintiffs by engaging in the aforesaid conduct which includes, but is not limited to, failing to provide an opportunity to cure as provided in the 2007 MLA, failing to provide a full "Royalty Year" to meet the minimum revenue requirement, failing to provide Chiu with reasons for why it was terminating the contract, failing to deliver on a promise that Japan would be covered within the geographic area of the license and taking the position that Chiu had no ownership stake in MPI despite a plethora of evidence to the contrary including that he was a signatory to the 2007 MLA itself.

60. The Plaintiffs have been damaged by the aforesaid conduct and continue

to sustain damages.

## COUNT III – FRAUD
### (Plaintiffs v. Pan Am and Lucas)

61.   The Plaintiffs repeat and reallege paragraphs 1 through 60 above as if individually set forth herein.

62.   Pan Am and Lucas, in concert or individually, committed fraud against the Plaintiffs by intentionally or recklessly misrepresenting to Chiu and MPI that Pan Am possessed exclusive rights to market and sell Pan Am branded products in Japan and that it had enforcement rights for its trademark there.  At the time that Pan Am made these representations, it knew that these representations were false as it had lost its exclusive trademark in Japan by reason of its failure to police/protect its mark.

63.   Pan Am and Lucas, in concert or individually, committed fraud against the Plaintiffs by acting to exclude Chiu from the Pan Am venture by, *inter alia*:

(a)   Creating falsified (i.e. backdated) corporate documents for MPI;

(b)   Withholding the Notice of Termination as well as the reasons for Pan Am's termination of the 2007 MLA in an effort to unlawfully deprive Chiu/MPI of their contractually entitled right to cure; and

(c)   Withholding information regarding the issues arising from Pan Am's trademark rights in Japan as well as Pan Am and Lucas' plans to form a new venture without Chiu all the while encouraging Chiu to continue to invest substantial resources into the venture.

64.   By their actions, Pan Am and Lucas deceived Chiu into continuing to finance the endeavor only to later unlawfully exploit the investments made by Chiu in

their own venture going forward.

## COUNT IV – BREACH OF FIDUCIARY DUTY
### (MPI and Chiu v. Lucas)

65.     The Plaintiffs repeat and reallege paragraphs 1 through 64 above as if individually set forth herein.

66.     Lucas breached the fiduciary duty he owed to MPI and Chiu by engaging in a pattern of conduct detrimental to MPI and Chiu as described above.

## COUNT V – TORTIOUS INTERFERENCE WITH CONTRACTUAL RELATIONS
### (MPI and Chiu v. Lucas)

67.     The Plaintiffs repeat and reallege paragraphs 1 through 66 above as if individually set forth herein.

68.     Lucas tortiously interfered with the contractual rights that the Plaintiffs had with Pan Am by, *inter alia*:

a)  Frustrating Plaintiffs' efforts to perform obligations under the 2007 MLA through Lucas' aforesaid conduct; and

b)  Interfering with Chiu/MPI's efforts to mitigate damages following Pan Am's purported termination of the 2007 MLA by making misrepresentations of the goods to be sold to Pan Am.

## JURY DEMAND

The Plaintiffs hereby demand a trial by jury on all counts so triable.

Wherefore, the Plaintiffs respectfully request that this Court:

1.  Enter judgment in their favor on all counts of the Complaint in the amount of $15,000,000 for each count;

2. Award them reasonable attorney's fees and costs; and

3. Grant any other relief this Court deems to be just and fair.

        Respectfully submitted,
        **THE PLAINTIFFS,**
        By their attorneys,

        /s/ Ronald M. Davids
        Ronald M. Davids, BBO No. 115110
        rdavids@davids-cohen.com
        Young B. Han, BBO No. 664126
        yhan@davids-cohen.com
        **DAVIDS & COHEN, P.C.**
        40 Washington Street, Suite 20
        Wellesley, MA 02481
        (781) 416-5055